IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:09-HC-2092-FL

| | | |
|---|---|---|
| FARLEY L. BERNARD, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| WILLY DAVIS, | ) | |
| | ) | |
| Respondent. | ) | |

This matter comes before the court on the motion for summary judgment (DE # 9) pursuant to Federal Rule of Civil Procedure 56 of respondent Assistant Superintendent at Bertie Correctional Institution Willy Davis ("respondent"). Also before the court are the motions to appoint counsel (DE # 3, and DE # 15) filed by petitioner Farley L. Bernard ("petitioner"). These matters are ripe for adjudication. For the following reasons, the court grants respondent's motion for summary judgment and denies petitioner's motions to appoint counsel.

## STATEMENT OF CASE

On January 10, 2007, petitioner was convicted of robbery with a dangerous weapon, possession of stolen goods, first-degree kidnapping, and fleeing to elude arrest in the Wake County Superior Court. (Resp't's Mem. Ex. 1, pp. 43-50.) Petitioner was sentenced to the following consecutive terms of imprisonment: (1) one hundred three (103) to one hundred thirty-three (133) months; (2) ten (10) to twelve (12) months; (3) one hundred sixteen (116) to one hundred forty-nine (149) months; and (4) ten (10) to twelve (12) months. (Id.) Petitioner proceeded *pro se* at his trial. (Id.)

Following his conviction, petitioner, through counsel, filed an appeal to the North Carolina Court of Appeals. See State v. Bernard, 190 N.C. App. 206, 661 S.E.2d 328 (May 6, 2002). The court of appeals found no error. Id. On June 13, 2008, petitioner filed a *pro se* petition for discretionary review in the North Carolina Supreme Court, which was denied on August 26, 2008. State v. Bernard, No. 282PO8, 666 S.E.2d 649 (Aug. 26, 2008).

On October 27, 2008, petitioner filed a *pro se* motion for appropriate relief ("MAR") in the Wake County Superior Court, which was denied on March 3, 2009. (Resp't's Mem. Exs. 7 and 8.) Petitioner then filed a *pro se* petition for writ of certiorari in the North Carolina Court of Appeals on April 15, 2009. (Id. Ex. 9.) On April 30, 2009, the court of appeals denied petitioner's certiorari petition. (Id. Ex. 11.) On May 18, 2009, petitioner filed a petition for a writ of certiorari in the North Carolina Supreme Court, which was dismissed on June 17, 2009. (Id. Ex. 12); State v. Bernard, No. 282PO8, 679 S.E.2d 134 (June 17, 2009).

On July 16, 2009, petitioner filed this *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. In his petition, petitioner alleges the following: (1) his conviction was obtained by denial of substitute counsel without a knowing, voluntary, valid waiver by petitioner at a critical stage of the proceedings; (2) his conviction was obtained by suppression, destruction, or alteration of material evidence which was favorable to petitioner's defense; (3) his appellate counsel was ineffective; and (4) his conviction was obtained by denial of his rights to present evidence in his own defense.

Respondent filed a motion for summary judgment on November 16, 2009, arguing that petitioner's claims are without merit. On December 7, 2009, petitioner filed a response to respondent's motion for summary judgment.

2

## STATEMENT OF FACTS

The facts as stated by the North Carolina Court of Appeals are summarized as follows:

> On 7 May 2006, John Clark (Clark) reported that a 2003 Toyota Camry had been stolen from Akelnovel, a store for which Clark was the District Operations Manager. Clark discovered that a brick had been used to break the glass in the door at Akelnovel, and the Toyota Camry had been stolen.

> On 9 May 2006, Althea Shaw-Williams (Shaw-Williams) was driving a Kia Sorento on Capital Boulevard in Raleigh, North Carolina, when Defendant drove next to her in Akelnovel's Camry. At trial she testified as follows: Defendant waved at Shaw-Williams, but Shaw-Williams did not know Defendant so she kept her "chin up" and kept driving. Defendant then swerved his car toward her causing Shaw-Williams to drive into the lane to her right and stop. The driver in the lane beside Shaw-Williams also careened into the far right lane and stopped. At this point, Shaw-Williams called 911. When asked whether Defendant's steering in Shaw-Williams' direction could have been accidental, Shaw-Williams testified, "[n]ot at all. I saw both of [his] hands on the wheel try to hit me."

> After Shaw-Williams' initial stop, she "tried to drive away[,][but] I could tell [Defendant] was ... driving towards me again, so I was screaming [to the 911 dispatcher] that ... he's still trying to follow me." The man in the lane to the right of Shaw-Williams left his vehicle and made "gestures" toward Defendant, as if to say, "what are you doing[?]" or "you're blocking traffic [.]" Defendant, in turn, gestured to Shaw-Williams to "come here[,]" to which Shaw-Williams responded by "just shaking my head no." Shaw-Williams again attempted to drive away from Defendant, but "it seemed as if ... every inch I made, he tried to ... interrupt me getting away." Shaw-Williams told the 911 dispatcher, "I think he's going to crash into me[.] ... [I] "wanted to jump out [of the vehicle, but] ... [the dispatchers] were telling me [not to] get out of the car[.]" Defendant then left his car and "[came] right over to [Shaw-Williams'] car." Defendant opened Shaw-Williams' car door, which was unlocked, because Shaw-Williams "wanted to jump out[.]" Shaw-Williams told Defendant "I don't know you[,]" but Defendant replied, "Yes, the f-k you do. Get the f-k over there." Defendant "shov[ed] me really hard to get over on the passenger side." Then, Defendant "sat on top of me" and "started hitting me on top of my hand[,]" which was on the gear shift. Defendant "wanted to drive [the car] away." Shaw-

3

Williams struggled with Defendant and eventually "push[ed] [herself]" out of the car to escape. Shaw-Williams explained that when she "felt like it was safe ... for me to take my foot off the brake, I just ... jumped out[.]"

Officer Robert Fiske (Fiske), of the Raleigh Police Department also testified that when he arrived at the scene, "a vehicle [was] ... just parked there[, and] ... [Defendant] had jumped ... into another vehicle[.]" When he spoke to Shaw-Williams, "[s]he was very shaken[, and] ... her hands were trembling. Her voice was ... broken up where she was very upset." Shaw-Williams appeared to have "an anxiety ... attack, she was so upset[,]" and "she had some scratches on her back." While he spoke to Shaw-Williams, police "located her vehicle[,]" which Defendant "took[,]" and the police "started chasing it."

Sidney Johnson (Johnson), the Deputy Sheriff for the City County Bureau of Identification in Wake County, testified that he collected photographs of and fingerprints from the 2003 Toyota Camry driven by Defendant, and Agent Andy Parker, the supervisor of the Latent Print Unit of the City-County Bureau of Identification, stated that five of the fingerprint impressions gathered by Johnson were "identified to [Defendant]."

Officer A.B. Caruana (Caruana), of the Raleigh Police Department, provided further testimony that he witnessed "[Defendant's] vehicle swerving in between traffic[,]" after he had taken Shaw-Williams' car. Caruana "manipulat[ed] traffic ... until I got directly behind [Defendant.]" "[A]t that point," Caruana said, "[Defendant] took off at a high rate of speed before I even turned [on] my lights[.]" When asked why Caruana characterized Defendant's speed as "fast[,]" Caruana stated that Defendant sped to "60, [or] 70 miles an hour, [then] accelerat[ed,] ... reach[ing] speeds from 90 to a hundred miles an hour." The "highest [speed] limit that [the] vehicle should have been traveling" was forty-five miles per hour. Caruana said the "chase went on for approximately 20[or] 25 minutes[,]" during which time Defendant "[ran] multiple vehicles off the road, [and ran] multiple lights[.]" Finally, Defendant "exited on to Hammond Road going the wrong way ... where he took a left on to Blount Street." Then, Defendant "sideswiped a vehicle on Blount Street and ... wreck [ed] his car[,]" after which the car chase ended.

Caruana testified, "[t]here is a video camera that's installed inside the police car[, and] [t]he entire chase was captured on the video."

4

Caruana further identified photographs of the vehicle that "was involved in the carjacking" and "the car chase that ensued." Detective D.R. Williams (Williams), of the Raleigh Police Department, testified that, at the termination of the car chase, Defendant "[tried] to make a right on to [an intersecting] street, but ... couldn't make the turn in time[.]" Instead, Defendant drove "into Ace's Towing, which is a business ... at the dead end of Blount Street." Williams "could see [that Defendant's] car had ... hit the fence[,]" and "his speed was such [that] ... [Defendant] could [not] stop in time[.]" Defendant "went through another section of another fence inside the lot ... and ... [struck] the wrecker ... behind the [second] fence." The door to the vehicle "was open" when Williams arrived, "but since the vehicle was wedged up against the truck and the fence ... the door wouldn't come all the way open."

Defendant testified at trial, explaining that Shaw-Williams "looks just like my [fiancé,]" and he believed, in fact, that Shaw-Williams was his fiancé. Defendant stated that "[my fiancé and I] were having a lot of problems[, and] I was depressed at the time, and ... drinking heavily. I was up the entire night." Defendant admitted that he exited his vehicle and approached Shaw-Williams on the highway, but said, "before I could even get to her door, she jumped out yelling and screaming at me." Defendant explained, "I decided to move the vehicle out of the road[,] ... when I heard the sirens." Defendant further stated, "I never disputed the fact that I eluded the police [,] ... [and][w]hen I seen [sic] the police coming, I panicked[;] ... I took off." Defendant also admitted, "I was intoxicated. I was up all night [, but] ... I have nothing to do with the car being stolen[.]" Defendant provided the following alibi with regard to the stolen vehicle: "I got to Virginia in that vehicle, but I wasn't the driver.... [A] friend of mine was driving that vehicle[,] ... and I [drove] to the store to buy more beer, and [sic] that's how I was driving that vehicle."

Bernard, 661 S.E.2d at *1-3.

## DISCUSSION

I.      Motion to Appoint Counsel

Petitioner filed two motions to appoint counsel to represent him in this action. There is no

constitutional right to counsel in habeas corpus actions. Pennsylvania v. Finley, 481 U.S. 551, 555

5

(1987). Under 18 U.S.C. § 3006A(a)(2)(B), a court may appoint counsel in a habeas corpus proceeding if it determines that "the interests of justice so require." The court does not perceive issues of great legal complexity in this case. Therefore, the interests of justice do not mandate the appointment of counsel. Accordingly, petitioner's motions are DENIED.

II.    Motion for Summary Judgment

A.    Standard of Review

Summary judgment is appropriate when there exists no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, 477 U.S. 242, 247 (1986). The party seeking summary judgment bears the burden of initially coming forward and demonstrating an absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the nonmoving party then must affirmatively demonstrate that there exists a genuine issue of material fact requiring trial. Matsushita Elec. Industrial Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. Anderson, 477 U.S. at 250.

The standard of review for habeas petitions brought by state inmates, where the claims have been adjudicated on the merits in the state court, is set forth in 28 U.S.C. § 2254(d). That statute states that habeas relief cannot be granted in cases where a state court considered a claim on its merits unless the decision was contrary to or involved an unreasonable application of clearly established federal law as determined by the United States Supreme Court, or the state court decision was based on an unreasonable determination of the facts. See 28 U.S.C. § 2254(d)(1) and (2). A state court decision is "contrary to" supreme court precedent if it either arrives at "a conclusion

6

opposite to that reached by [the Supreme] Court on a question of law" or "confronts facts that are

materially indistinguishable from a relevant Supreme Court precedent and arrives at a result

opposite" to that of the Supreme Court. Williams v. Taylor, 529 U.S. 362, 405 (2000). A state court

decision "involves an unreasonable application" of supreme court law "if the state court identifies

the correct governing legal principle from [the Supreme] Court's cases but unreasonably applies it

to the facts of the particular state prisoner's case." Id. at 407. A state court decision also may apply

Supreme Court law unreasonably if it extends existing Supreme Court precedent to a new context

where it does not apply, or unreasonably refuses to extend existing precedent to a new context where

it should apply. Id. The applicable statute

> does not require that a state court cite to federal law in order for a
> federal court to determine whether the state court decision is an
> objectively reasonable one, nor does it require a federal habeas court
> to offer an independent opinion as to whether it believes, based upon
> its own reading of the controlling Supreme Court precedents, that the
> [petitioner's] constitutional rights were violated during the state court
> proceedings.

Bell v. Jarvis, 236 F.3d 149, 160 (4th Cir. 2000), cert. denied, 534 U.S. 830 (2001). Moreover, a

determination of a factual issue made by a state court is presumed correct, unless rebutted by clear

and convincing evidence. See 28 U.S.C. § 2254(e)(1).

7

B.    Analysis

    1.    Denial of Substitute Counsel

In his first claim, petitioner alleges that his rights pursuant to the Sixth Amendment of the

United States Constitution were violated because the trial court refused to allow his request for

substitute counsel. Accordingly, petitioner asserts that his waiver to court-appointed counsel was

involuntary.

The court of appeals adjudicated this claim and denied it as without merit. The court of

appeals made the following findings in its determination that the trial court did not err by denying

petitioner's motion for substitute counsel:

> [T]he [trial] court gave Defendant the opportunity to 'put on the
> record whatever you want to, sir[,]' regarding his dissatisfaction with
> Mr. Cline, and Defendant detailed his reasons for requesting the
> discharge Mr. Cline for the appointment of substitute counsel: 'Your
> Honor, I'm not saying that Mr. Cline is not competent and able. What
> I'm saying is that when I asked him about my particular case, he told
> me that I didn't have any defense [ .] ... I'm facing a lot of time with
> these charges, and I wouldn't want Mr. Cline to represent me when
> he's telling me I don't have any defense [.] ... [H]e's been lying to
> me, and me and him has been [sic] at each other ever since the
> beginning of this case.' Defendant stated, 'Mr. Cline refused to
> contact any witnesses[, and] ... Mr. Cline told me I had no out-of-state
> detainers, when in fact I did have out-of-state detainers[.]'
>
> The trial court allowed Defendant and Mr. Cline to elaborate on the
> allegations Defendant proffered. Mr. Cline responded, while under
> oath:
>
>> [T]he only witness that [Defendant]
>> told me to contact was the wrecker
>> operator at Ace Towing. I went down
>> to Ace Towing ... [and][t]he day I
>> went, Mr. Massey, I believe it was his
>> name, was not there. I talked to the
>> lady in the office. She showed me ...
>> tire marks and showed me where the

8

> new portion of the fence had been put
> up and showed me some damage on
> the wrecker, which she said was still
> there from the defendant's driving.... I
> saw some damage.... I did tell
> [Defendant] that I didn't see why he
> would want him to come to court,
> because it was just another witness
> who would put him behind the
> driver's seat of a stolen car, and that I
> strongly suggested he not use him; but
> I did call Mr. Massey, and I gave
> [Defendant] his name and phone
> number[.]

> The trial court further inquired of Mr. Cline, '[Defendant] made an
> allegation you lied to him. I want you to respond to that.' Mr. Cline
> stated, 'I have not lied to him. I have no reason to lie to him. I did tell
> him that the defenses he was putting forth didn't sound very good to
> me, and that, you know, there needs to be some other defense.' When
> asked about the 'out-of-state detainers[,]' Mr. Cline responded, 'I told
> him that there was no indication that there was [sic] any. And I
> checked the Clerk's record and Clerk's computer screen, and I found
> no fugitive warrants.' Several months later, Mr. Cline 'was assigned
> to a fugitive matter from the state of Virginia, where [Defendant] was
> allegedly wanted for larceny.'

Bernard, 661 S.E.2d at *4-5. The court of appeals reasoned that, based upon the foregoing facts,

petitioner's original counsel was reasonably competent to present petitioner's case and that the nature

of the conflict between petitioner and counsel was not such as would render counsel incompetent

or ineffective to represent petitioner. Id. at *5. In particular, the court of appeals found the disputes

between petitioner and his counsel were analogous to disputes over trial tactics, which do not

generally render an attorney's assistance ineffective. Id. (citing State v. Thacker, 301 N.C. 348, 352,

271 S.E.2d 252, 255 (1980)).

Generally, a criminal defendant has the right pursuant to the Sixth Amendment of the United

States Constitution to "the counsel he believes to be best." United States v. Gonzalez-Lopez, 548

9

U.S. 140, 140 (2006); see Faretta v. California, 422 U.S. 806, 818 (1975). However, the right to choose counsel is not without limit. Gonzalez-Lopez, at 152. The trial court maintains "wide latitude in balancing the right to counsel of choice against the needs of fairness . . . and against the demands of its calendar." Id. at 152 (citations omitted). Moreover, a defendant must show good cause as to why he should receive substitute counsel. United States v. Gallop, 838 F.2d 105, 107 (4th Cir. 1988). In general, good cause exists when denying substitute counsel would deny the defendant a constitutionally adequate defense. United States v. Johnson, 114 F.3d 435, 443 (4th Cir. 1997) ("A total lack of communication is not required. Rather an examination of whether the extent of the breakdown prevents the ability to conduct an adequate defense is the necessary inquiry."); United States v. Jennette, No. 07-4382, 2010 WL 2725591, *3 (4th Cir. July 2, 1010). "[O]nce the trial court has appropriately determined that a substitution of counsel is not warranted, the court can insist that the defendant choose between continuing representation by his existing counsel and appearing *pro se*." Gallop, 838 F.2d at 109 (citations omitted).

In this case, the evidence demonstrates that the trial court did not identify any substantial complaints or conflicts which would have prevented petitioner's attorney from presenting an adequate defense. In fact, petitioner himself stated: "I'm not saying that Mr. Cline is not competent and able." (Tr. 1, p. 25.) Moreover, petitioner has not presented any evidence demonstrating that the trial court violated his constitutional rights, and that he was in fact denied a constitutionally adequate defense. Accordingly, as found by the court of appeals, petitioner's complaints amount to a disagreement over trial tactics. Based upon the foregoing, petitioner is unable to establish that the adjudication by the court of appeals involved an unreasonable determination of the facts, and respondent is entitled to summary judgment on this claim.

10

On a related note, the court next examines petitioner's waiver of his right to court-appointed counsel. Petitioner contends his waiver to court-appointed counsel was not voluntary. The defendant who seeks to invoke his right to represent himself, thereby waiving counsel, must do so "clearly and unequivocally." Fields v. Murray, 49 F.3d 1024, 1029 (4th Cir. 1995) (citations omitted). This is because, in doing so, the defendant must waive the constitutional right to counsel. Id. at 1028. The requirement of a clear and unequivocal demand for self-representation enables the reviewing court to navigate between the competing interests of the right to counsel and the right to self-representation. Id. at 1028-29. Once the defendant has made a clear and unequivocal request, the trial court must determine whether he waives his right to counsel "knowingly and intelligently." Faretta, 422 U.S. at 835.

The North Carolina Court of Appeals adjudicated this claim, and made the following findings:

> On 11 September 2006, the trial court held a pre-trial hearing on counsel's motion to withdraw, during which the court explained the following to Defendant:
>
> Sir, let me explain this to you. Mr. Cline has been practicing in Wake County for a long time. He's a very good criminal defense lawyer. I'm telling you that, don't hesitate to put that on the record. He's been appointed to represent you. You're charged with some serious felonies that carry a long, long, long time in prison: Robbery with a dangerous weapon, a Class D felony, a maximum of 229 months. Possession of stolen property is a Class H felony. That carries a maximum punishment of 30[ ] month[s]. First degree kidnaping is a Class C felony. That carries a maximum punishment of 261 months. And speeding to elude is a Class H felony carrying a maximum punishment of 30 months. Now, you do have the right to have a lawyer. And the Court has appointed a very good lawyer to represent you. You also have the right to hire your own lawyer. And you have the right to represent yourself. I will tell you that the Court is of the opinion that you need a lawyer. Do you understand what I have told you about the maximum punishment of the charges that you are charged with?

11

Defendant responded, "Yes, I do, Your Honor." Defendant thereafter made a motion for substitute counsel, which the court denied, stating the following:

The Court: So, your motion to remove Mr. Cline [and] get another court appointed lawyer is denied. And Mr. Cline will continue to be your [attorney.]

Defendant: I'm going to represent myself. I'm going to exercise my constitutional right to represent myself, or I'll ... be my own attorney.

Thereafter, the following colloquy transpired:

The Court: We'll not continue the scheduled court date.

Defendant: I do not want the continuance. There's a motion for a speedy trial, and I'd like for my motion for speedy trial to go through. I do not want the continuance at all.

At a second pre-trial hearing on 6 November 2006, the court advised Defendant to again consider Mr. Cline, the court-appointed lawyer:

The Court: [Defendant], let me say this to you. You are charged with some serious felonies and I know Mr. Cline. I know him to be a good lawyer.... [Y]ou can represent yourself or you can hire your own lawyer. The Court will not appoint you another lawyer. If you choose to represent yourself, I am going to order Mr. Cline to be standby counsel for you....

You are your own lawyer. You are foolish to do this. With these serious criminal charges you need a lawyer. Mr. Cline is a good lawyer. I have known him for several years. I have tried many cases with him. He is a good lawyer. So the choice is what you want to do....

Defendant asked the court several questions, including "how I would address the Court for [a] motion if I represent myself." Thereafter, Defendant decided, "Okay. I will represent myself." The court clarified, "You are going to waive your rights to have a lawyer ... and you are going to represent yourself?" Defendant responded, "Yes." Again, the court reiterated the possible punishments Defendant faced upon guilty verdicts on his four indictments, and the court asked, "[do y]ou understand that?" Defendant responded, "Yes, I do."

Bernard, 206 S.E.2d at *6-7.

The court of appeals further found that petitioner executed a written waiver of counsel. Id. at *7. Based upon the foregoing, the court of appeals held that the trial court engaged petitioner in a thorough inquiry regarding his waiver of counsel, and that petitioner's waiver of counsel was knowing and voluntary. Id. This finding is one of fact, entitled to a presumption of correctness. Fields, 49 F.3d at 1032 (stating that question of whether a defendant invoked right to self-representation is one of fact entitled to the presumption of correctness). Petitioner has the burden to rebut this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). The record establishes that petitioner cannot rebut this presumption. Thus, respondent is entitled to summary judgment on this claim.

   2.      Failure to Preserve 911 Tape

In his second claim, petitioner alleges that his conviction was obtained in violation of the United States Supreme Court's ruling in Brady v. Maryland, 373 U.S. 83 (1963). Petitioner alleges that his Brady rights were violated when the state altered the 911 audio tape of the conversation between the victim Althea Shaw-Williams ("victim") and the 911 call center.[1]

The state has a constitutional duty to disclose to a criminal defendant evidence which is material to the proof of innocence or guilt pursuant to the Supreme Court's ruling in Brady. Brady, 373 U.S. at 87. However, the issue in this case deals with the failure of the state to preserve evidence which is analyzed under a different standard. See United States v. McClure, 918 F.2d 956, 1990 WL 180122, *4 (4th Cir. Nov. 21, 1990). Arizona v. Youngblood, 488 U.S. 51 (1989),

---

[1] Respondent contends that this issue is procedurally barred. Although questions of procedural bar are usually addressed first, the court finds it is in the interest of judicial economy to exercise its discretion and proceed directly to the merits of petitioner's claim. See Lambrix v. Singletary, 520 U.S. 518, 525 (1997) (finding that a court may bypass procedural bar analysis and address claim on merits if it is "easily resolvable against the habeas petitioner").

13

addresses the issue of the state's failure to preserve evidence. Accordingly, the <u>Youngblood</u> test and not <u>Brady</u> is applicable to the case before the court. <u>McClure</u>, 918 F.2d at *4.

In <u>Youngblood</u>, the Supreme Court held "that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." <u>Youngblood</u>, 488 U.S. at 58. Bad faith depends upon the law enforcement officer's knowledge of the exculpatory nature of the evidence at the time it was destroyed. <u>Id.</u> at 56. Additionally, to meet the standard of materiality, the evidence in question must possess exculpatory value that was apparent before it was destroyed and be of such nature that petitioner would be unable to obtain comparable evidence by other reasonably available means. <u>California v. Trombetta</u>, 467 U.S. 479, 489 (1984).

Petitioner states his attorney played the 911 tape for him prior to trial, and he was able to hear a conversation between himself and the victim. He states the conversation between himself and the victim was deleted from the tape played at trial. Petitioner claims the alleged deleted conversation "proves that [he] did not rob or kidnap Mrs. Williams and that [he] had mistaken Mrs. Williams for [his] fiancé [] Denise Bailey. The tape also proves Mrs. Williams lied to the police about what happened when [he] approached her." (Pet. Attach. Pet.'s Aff. p. 4.)

A petitioner must show bad faith on part of law enforcement to demonstrate a due process violation on a failure to preserve evidence claim. <u>See Youngblood</u>, 488 U.S. at 57-58 ; <u>United States v. Linder</u>, 66 F.3d 317, 1995 WL 550235, *1 (4th Cir. Sept. 15, 1995) (finding no error on failure to give missing evidence instruction where petitioner failed to establish that government's failure to preserve tape recording was in bad faith). Here, the evidence in the record does not indicate that the law enforcement officers acted with bad faith. For instance, the record does not clearly demonstrate that the 911 tape-recording was altered. In particular, the record reflects that petitioner

14

was aware that the audio tape of the victim's 911 call was of poor quality prior to trial. (Resp't's Ex. 2, p. 32 and Tr.1 pp. 34-35.) The record reflects that petitioner questioned the victim about the 911 call at trial. (Tr. 1 p. 166.) The victim stated that she had a conversation with petitioner during that 911 call, but stated she could hear the conversation on the tape played at trial. (Id.) At best, it appears that any alteration of the 911 audio tape was accidental or negligent, rather than intentional. Additionally, petitioner has not presented any evidence that there was reasonable probability that law enforcement officers knew the 911 tape contained exculpatory evidence. Accordingly, petitioner has not met his burden of demonstrating that the alleged destruction of the evidence even occurred, nor that it was motivated by bad faith.

Even if petitioner could meet his burden of demonstrating that the alleged destruction of evidence was motivated by bad faith, he has not demonstrated that it resulted in prejudice. In particular, petitioner does not state what was said in the alleged missing conversation, or how the alleged missing conversation would have affected the outcome of his trial. Instead, he only makes vague conclusory allegations that the conversation would have demonstrated his innocence. Petitioner's unsupported allegations do not warrant relief. Nickerson v. Lee, 971 F.2d 1125, 1136 (4th Cir. 1992), abrogated on other grounds recognized by Yeatts v. Angelone, 166 F.3d 255 (4th Cir. 1999) ("In order to obtain an evidentiary hearing . . . a habeas petitioner must come forward with some evidence that the claim might have merit. Unsupported conclusory allegations do not entitle a habeas petitioner to an evidentiary hearing."). Petitioner has not demonstrated that the outcome of his trial would have been different if the alleged conversation between himself and the victim had been audible. Accordingly, the court finds that this claim is without merit.

On a related note, petitioner appears to allege that he did not receive a copy of the 911 audio tape in a timely manner in violation to his right to due process pursuant to the Fourteenth

Amendment of the United States Constitution. An action violates the Due Process Clause if it "so infect[s] the [proceeding] with unfairness as to make the resulting [sentence] a denial of due process." Ivey v. Catoe, 36 Fed. Appx. 718, 728-29 (4th Cir. Mar. 26, 2002) (quotations omitted) (citing Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)). Under the Antiterrorism and Effective Death Penalty Act of 1996, habeas corpus relief may only be granted if the error had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (adopting harmless error standard on habeas review); Barbe v. McBride, 521 F.3d 443, 453 (4th Cir. Apr. 7, 2008).

The court of appeals adjudicated this claim and found it to be without merit. In evaluating petitioner's claim, the court of appeals found that petitioner received a copy of the 911 tape on the Friday preceding the Monday on which the trial began. Bernard, 661 S.E.2d. at *11. The court of appeals further found: "The evidence in this case incriminating Defendant is overwhelming: fingerprints, photographs and the testimony of multiple eyewitnesses-including police officers, the victim of Defendant's attack, and Defendant himself-provide evidence of Defendant's inculpatory actions in this case." Id. at * 12. Based upon the foregoing, the court of appeals found that any error in the manner in which the prosecution provided discovery to petitioner was harmless due to the overwhelming evidence of petitioner's guilt that was presented at trial. Id. Petitioner has not provided any concrete evidence to demonstrate the alleged delay in receiving the 911 tape had a substantial and injurious effect or influence in determining the jury's verdict. Accordingly, petitioner has not demonstrated that the court of appeals' denial of this claim constituted an unreasonable determination of the facts or a decision contrary to or involving an unreasonable application of

Supreme Court precedent. Thus, petitioner's second claim is without merit.

3.      Ineffective Assistance of Appellate Counsel

In his third claim, petitioner alleges that he received ineffective assistance of appellate counsel. In his first ineffective assistance of appellate counsel claim, petitioner contends his appellate counsel failed to raise petitioner's above-stated claim regarding the 911 tape. For the above-stated reasons, the court has found that petitioner's claim is without merit. Failure to raise a meritless claim does not fall below "an objective standard of reasonableness." See Lockhart v. Fretwell, 506 U.S. 364, 382 (1993); Strickland, 466 U.S. at 687-91. Thus, this ineffective assistance of appellate counsel claim is without merit.

In his second ineffective assistance of appellate counsel claim, petitioner alleges his appellate counsel failed to obtain sworn affidavits from witnesses. To prevail on a claim of ineffective assistance of appellate counsel, a petitioner must show that counsel's representation was objectively unreasonable and that a reasonable probability exists that, but for the attorney's error, he would have prevailed on his appeal. Smith v. Robbins, 528 U.S. 259, 285 (2000) (citing Strickland, 466 U.S. at 687–91). Appellate counsel is not required to assert all nonfrivolous issues on appeal, "but rather may select from among them in order to maximize the likelihood of success on appeal." Smith, 528 U.S. at 288. Reviewing courts must presume that in determining which issues to appeal, appellate counsel selected those issues most likely to afford relief. See, e.g., id.

Petitioner states that his appellate counsel should have obtained affidavits from his ex-fiancé Denise Bailey and his sister Alethea Crawford in support of his defense to the crimes at issue. In North Carolina, a party is not permitted to raise an issue for the first time on appeal. In re Crawford, 134 N.C. App. 137, 142, 517 S.E.2d 161, 164 (1999); N.C.R.App.P. 10(b)(1); State v. Benson, 323 N.C. 318, 322, 372 S.E.2d 517, 519 (1988) (holding that a defendant may not raise a constitutional

17

issue on appeal not presented to the trial court), abrogated on other grounds recognized by, State v. Hooper, 358 N.C. 122, 591 S.E.2d 514 (2004); State v. Robbins, 319 N.C. 465, 496, 356 S.E.2d 279, 298, cert. denied, 484 U.S. 918 (1987) (finding that theory not presented to trial court and first raised on appeal not properly before appellate court). Petitioner did not raise his theory regarding the affidavits from Denise Bailey or Alethea Crawford in the trial court. Thus, the evidence supporting this claim was not part of the trial court record, and petitioner's appellate counsel had no obligation to bring such evidence to the North Carolina Court of Appeals' attention. Even if these claims could have been raised in the court of appeals, petitioner has not demonstrated that his appellate counsel was ineffective for failing to raise them. In particular, petitioner has not demonstrated how the affidavits of Alethea Crawford or Denise Renee Bailey would have been helpful to him at trial. Alethea Crawford's affidavit states that petitioner's trial counsel Mr. Cline failed to contact the Ace Towing driver Ruben Massey. However, petitioner's counsel Mr. Cline himself admitted at trial that he did not contact Ruben Massey. (Tr. III, pp. 414-15.) As for Denise Renee Bailey's affidavit, it discusses the fact that petitioner's actions were a result of mistaken identity. However, this was not a defense to the crimes at issue. Moreover, petitioner acting, in part, pro se could have obtained these affidavits. Finally, the evidence in the record demonstrates that petitioner's appellate counsel chose to exercise his discretion to proceed with other claims on appeal. Based upon the foregoing, the court finds that petitioner has failed to demonstrate that his appellate counsel's performance was objectively unreasonable, and respondent is entitled to summary judgment on this claim.

4.      Denial of Right to Present Evidence

In his final claim, petitioner argues he was not provided the opportunity to present evidence in his own defense. Respondent contends this claim is procedurally defaulted. Under the doctrine of procedural default, a federal court is precluded from reviewing the merits of any claim that was

18

found to be procedurally barred by the state court on adequate and independent state grounds. Coleman v. Thompson, 501 U.S. 722, 731-32 (1991). However, procedurally defaulted claims can be reviewed by a federal habeas court if the petitioner demonstrates cause and prejudice, or that the failure to consider the claim will result in a fundamental miscarriage of justice. Coleman, 501 U.S. at 750.

Petitioner did not raise this claim on direct appeal, but did raise it in his MAR. The MAR court held that this claim was procedurally barred pursuant to N.C. Gen. Stat. § 15A-1419(a)(1).[2] The procedural bar rule of N.C. Gen. Stat. § 15A-1419(a) is an independent and adequate state ground precluding federal habeas review. See Williams v. French, 146 F.3d 203, 209 (4th Cir. 1998), cert. denied, 525 U.S. 1155 (1999); Boyd v. French, 147 F.3d 319, 332 (4th Cir. 1998), cert. denied, 525 U.S. 1150 (1999). Therefore, petitioner's claim is procedurally defaulted, and the court is precluded from reviewing this claim.

Petitioner contends he is able to overcome the procedural default because he is able to establish cause and prejudice. As grounds for cause, petitioner alleges that he received ineffective assistance of appellate counsel because his appellate counsel did not raise his claim regarding the denial of his right to present evidence on direct appeal. Petitioner, however, has not effectively raised an ineffective assistance of appellate counsel claim in state court alleging that his appellate counsel was ineffective for failing to raise the instant claim. Thus, petitioner's claim that his appellate counsel's failure to raise this claim constituted cause to excuse his procedural default is itself unexhausted. Edwards v. Carpenter, 529 U.S. 446, 453 (2000) ("An ineffective-assistance-of-

---

[2] N.C. Gen. Stat. § 15A-1419(a)(1) reads in pertinent part: "the following . . .[is a] ground[] for the denial of a motion for appropriate relief, including motions filed in capital cases: (1) Upon a previous motion made pursuant to this Article, the defendant was in a position to adequately raise the ground or issue underlying the present motion but did not do so."

counsel claim asserted as cause for the procedural default of another claim can itself be procedurally defaulted"); Murray v. Carrier, 477 U.S. 478, 488-89 (1986) (finding ineffective assistance of counsel claim used to excuse procedural default must be exhausted in state court proceedings.) Thus, petitioner has not adequately stated cause for his procedural default.

Petitioner also alleges that he is able to establish cause for his procedural default because he is in the possession of newly discovered evidence. In order to demonstrate cause, petitioner must make "a showing that the factual or legal basis for a claim was not reasonably available to counsel." McCarver v. Lee, 221 F.3d 583, 591 (4th Cir. 2000) (quotation and citations omitted). Petitioner does not specify what newly discovered evidence he relies upon to demonstrate cause for his procedural default. The court assumes petitioner is relying on affidavits submitted from his ex-fiancé Denise Bailey and from his sister Alethea Crawford. Petitioner has not demonstrated that the information contained in the affidavits was not available to him prior to trial. Thus, the court finds that petitioner is unable to establish cause for his procedural default.

The court next examines whether petitioner is able to establish prejudice. To establish prejudice, a petitioner must show "not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." McCarver, 221 F.3d at 592. Petitioner has not presented any evidence, outside of conclusory allegations, to demonstrate prejudice necessary to overcome procedural default. See Nickerson, 971 F.2d at 1136 ("Unsupported, conclusory allegations do not entitle a habeas petitioner to an evidentiary hearing."). Thus, petitioner is unable to demonstrate prejudice. Because petitioner is unable to demonstrate cause of prejudice, this claim is procedurally defaulted.

Even if this claim was not procedurally defaulted, petitioner's ineffective assistance of counsel claim is without merit. A pro se defendant may not claim his or her own ineffectiveness as a ground for appeal. Faretta, 422 U.S. at 834 n.46; Peoples v. United States, 403 F.3d 844, 849 (7th cir.), cert. denied, 546 U.S. 935 (2005) ("One who exercises the right of self-representation cannot contend that he received ineffective assistance of counsel."); Odman v. United States, No. 1:04CV44, 2005 WL 3409656, *3 (W.D.N.C. Dec. 9, 2005). Based upon the foregoing, respondent is entitled to summary judgment for this claim.

III.    Certificate of Appealability

Rule 11 of the Rules Governing Section 2254 Cases ("Habeas Rules") provides "the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Having determined petitioner is not entitled to relief and respondent is entitled to dismissal of the petition, the court considers whether petitioner is nonetheless entitled to a certificate of appealability with respect to one or more of the issues presented in his habeas petition.

A certificate of appealability may issue only upon a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Where a petitioner's constitutional claims have been adjudicated and denied on the merits by the district court, the petitioner must demonstrate reasonable jurists could debate whether the issue should have been decided differently or show the issue is adequate to deserve encouragement to proceed further. Miller-El v. Cockrell, 537 U.S. 322, 336-38 (2003); Slack v. McDaniel, 529 U.S. 473, 483-84 (2000).

Where a petitioner's constitutional claims are dismissed on procedural grounds, a certificate of appealability will not issue unless the petitioner can demonstrate both "(1) 'that jurists of reason would find it debatable whether the petition [or motion] states a valid claim of denial of a constitutional right' and (2) 'that jurists of reason would find it debatable whether the district court

21

was correct in its procedural ruling.'" Rose v. Lee, 252 F.3d 676, 684 (4th Cir. 2001) (quoting Slack, 529 U.S. at 484). "Each component of the § 2253(c) showing is part of a threshold inquiry, and a court may find that it can dispose of the application in a fair and prompt manner if it proceeds first to resolve the issue whose answer is more apparent from the record and arguments." Slack, 529 U.S. at 484-85.

After reviewing the claims presented in the habeas petition in light of the applicable standard, the court finds reasonable jurists would not find the court's treatment of any of petitioner's claims debatable or wrong and none of the issues are adequate to deserve encouragement to proceed further. Accordingly, a certificate of appealability is denied.

<h2 style="text-align:center">CONCLUSION</h2>

For the foregoing reasons, petitioner's motions for appointment of counsel (DE # 3 and DE # 15) are DENIED. Respondent's motion for summary judgment (DE # 9) is GRANTED. The certificate of appealability is DENIED. The Clerk of Court is DIRECTED to close this case.

SO ORDERED, this the 28th day of September, 2010.

LOUISE W. FLANAGAN
Chief United States District Judge